1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| SIDEPRIZE LLC D/B/A PRIZEPICKS,<br><br>    Plaintiff,<br><br>    v.<br><br>JUDAH HUFFMAN,<br><br>        Defendant. | Case No.:<br><br>**COMPLAINT FOR EMERGENCY, PRELIMINARY, AND PERMANENT INJUNCTIVE AND OTHER RELIEF**<br><br>**JURY DEMAND** |

SidePrize LLC d/b/a PrizePicks ("PrizePicks" or the "Company"), by and through the undersigned counsel, alleges as follows:

## PRELIMINARY STATEMENT

1.      PrizePicks brings this action against its former employee Judah Huffman ("Defendant" or "Huffman") to enjoin Huffman from (1) using or disclosing trade secret information he stole from PrizePicks during his employment and (2) working for

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

1

PrizePicks' competitor in the daily fantasy sports ("DSF") industry, DraftKings Inc. ("DraftKings"), in violation of his restrictive covenant agreement with PrizePicks.

2.    PrizePicks also seeks to enjoin Huffman from further destroying additional documents, data, and information in his possession, custody, or control after he surgically deleted volumes of information from his Company laptop and phone before he returned them to PrizePicks at the end of his employment.  Finally, PrizePicks seeks to compel Huffman to remove PrizePicks' confidential and trade secret information from his personal ChatGPT account, as described below.

3.    Before resigning his employment with PrizePicks as its Director of Social Media on or about May 16, 2024, Huffman surreptitiously stole PrizePicks' most closely guarded trade secret documents regarding its marketing operations by downloading those documents to his personal ChatGPT account.  At the same time, he was exfiltrating PrizePicks' trade secrets and confidential information, Huffman was also engaged in negotiations with DraftKings regarding employment as its social media director.  Based on information PrizePicks uncovered in its investigation of this matter, it appears that Huffman likely leveraged the trade secret documents he stole from PrizePicks to obtain a more favorable compensation package from DraftKings (from $200,000 in annual salary to $210,000).  All the while, Huffman represented to PrizePicks' management that he had received a job offer from a competitor but had no intention of joining a competitor or using the offer to obtain a better compensation package from PrizePicks.

4.    Huffman accepted DraftKings' employment offer on May 2, 2025 and notified PrizePicks that he was resigning.  When PrizePicks' management inquired as to where he was going and whether he had accepted employment with a competitor, Huffman blatantly and repeatedly lied, claiming, among other things, that the terms of his new employment were not finalized, and he was not joining a competitor.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

2

5.      At the end of his employment with PrizePicks, Huffman returned his Company-issued laptop computer and mobile telephone.  Through preliminary forensic inspection of the devices, PrizePicks has discovered that Huffman surgically deleted volumes of information from the devices, including, but not limited to, text messages, downloads, browsing histories, and related data and information that would have shed light on his wrongdoing.

6.      Upon information and belief, Huffman began his employment with PrizePicks in late May or early June in violation of the noncompetition provisions of his Employment Covenants Agreements ("Agreement")[1].

7.      As shown below, PrizePicks will be irreparably harmed if the Court does not intervene to stop Huffman from working for DraftKings and using or disclosing PrizePicks' trade secrets for DraftKings's benefit.

8.      PrizePicks brings this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. ("DTSA") and Washington law (breach of contract and breach of fiduciary duty).

## PARTIES

9.      SidePrize LLC d/b/a PrizePicks is a Georgia limited liability company with its headquarters at 1055 Howell Mill Road, Suite 1400, Atlanta, GA 30318.

---

[1] All capitalized terms are defined in the Agreement. A true and correct copy of Huffman's Agreement is attached hereto as Exhibit A. Huffman signed a 2023 Employment Covenants Agreement at the inception of his employment, which was superseded by the 2024 Agreement attached hereto as Exhibit A. Specifically, Section 19 of the Agreement provides that it "supersedes any prior communications, agreements or understandings, whether oral or written between the Parties relating to the subject matter of this Agreement." Ex. A ¶ 19. The Agreement also "includes Appendices A and B which are incorporated by reference," which together with the Agreement itself "constitute[] the entire agreement between the Parties concerning the subject matter of th[e] Agreement." *Id.*

| COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF | KABAT CHAPMAN & OZMER LLP<br>171 17TH ST NW, SUITE 1550<br>ATLANTA, GA 30363<br>(404) 400-7300 |
| --- | --- |

10.     Defendant Huffman was employed by PrizePicks as Director of Social Media until he resigned and left the company on May 16, 2025.

11.     At all times material hereto, Defendant Huffman is an individual who, upon information and belief, resides in Washington at 110 12th Avenue Kirkland, Washington 98033, where he may be served with process.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 by reason of 18 U.S.C. § 1836(c), and supplemental jurisdiction over the related state claims for Huffman's breaches of contract and fiduciary duty under 28 U.S.C. § 1367.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because this Court has personal jurisdiction over Huffman, who upon information and belief, resides in Kirkland, Washington, which is within this judicial district.

## FACTUAL BACKGROUND

**A.    PrizePicks is a Leading Provider of Daily Fantasy Sports Gaming Operations.**

14.     PrizePicks, headquartered in Atlanta, Georgia, is the fastest-growing DFS platform, available in over 40 states and most of Canada.  With PrizePicks, users leverage their skills, sports knowledge, and statistical analyses to predict athlete performance and earn money.  PrizePicks competes directly with several other online North American sports gaming operators, including DraftKings, which competes with PrizePicks for the

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

same total addressable market of sports gaming enthusiasts, including, but not limited to, its "Pick6" DFS product.[2]

15.    The DFS industry is highly competitive.  Online-based companies compete for new and existing customers among sports enthusiasts in states in which they operate through costly social media campaigns and customer acquisitions.   Social media engagement is critical to foster brand awareness, build and establish customer loyalty, cultivate a community, communicate through social channels with consumers, address customer concerns, inform competitive positioning, drive gameplay, and inform future product development strategy.   For these reasons, PrizePicks' confidential and proprietary competitive information, including but not limited to organizational goals, marketing priorities and strategies, social media analytics, business targets, consumer communication, competitive strategies, regulatory planning, product planning, and brand planning, is highly valuable, and PrizePicks invests considerable time and resources in protecting such information.

**B.    Huffman's Employment, His Access to PrizePicks' Confidential, Proprietary, and Trade Secret Information, and His Duty to Protect the Same.**

16.    PrizePicks hired Huffman in May 2023 as its Director of Social Media.  In that role, Huffman was directly responsible for developing a national cohesive strategy across all consumer-facing social media platforms and creating custom quantifiable reporting for measuring consumer engagement.

17.    As PrizePicks' Director of Social Media, Huffman had wide-ranging access to PrizePicks' most closely guarded trade secret information regarding the

---

[2] Even though PrizePicks' DFS product is distinct from DraftKings' primary Sportsbook offering, DraftKings competes with PrizePicks as to its "Pick6" product. Accordingly, Huffman's new role as Director of Social & Community (Sportsbook) for DraftKings, discussed below, targets the exact same market of sports enthusiasts.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

5

Company's organizational goals, marketing priorities and strategies, social media analytics, business targets, goals, consumer communications, competitive strategies, regulatory planning, product planning, and brand planning.

18.    Huffman was responsible for and gained access to highly confidential, proprietary, and trade secret information in PrizePicks' development of current and prospective consumer targets and relationships; maintenance of brand identity; specific upcoming promotional campaigns; advertising plans; customer data; customer lists on social-media accounts; confidential plans, pricing, developments, and strategies; and roadmap and competitive strategies through the end of 2025 and beyond.

19.    In his role at PrizePicks, Huffman participated in daily, weekly, and monthly meetings and received regular briefings and access to documents that informed, shaped, and developed PrizePicks' social media and marketing strategies and identified strengths and weaknesses, target markets, social media engagement, member complaints, business strategy, performance information, and product offerings.  All this information is highly confidential and would be invaluable to PrizePicks' competitors.  Huffman's inside knowledge of PrizePicks' innovation, differentiations, and growth plans could be straightforwardly leveraged by competitors to unfairly capture market share and misappropriate brand identity directly from PrizePicks.

20.    Accordingly, PrizePicks invests significant time and resources in ensuring its enterprise is secure.  The following is a non-exhaustive list of measures that PrizePicks takes to prevent unauthorized data exfiltration and protect its confidential, proprietary, and trade secret information:

- PrizePicks uses a Google Workspace Enterprise platform to store and manage its documents.  By default, only the user who creates a document has access to it, and further access must be affirmatively granted by a user

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

who has been granted access and has been given the appropriate permissions to grant further access. Further, by default, all shared links are set to only allow access to the shared document if the recipient of the link has a PrizePicks Google Workspace account, thereby preventing the unintentional sharing of documents outside of the organization.

- PrizePicks uses a data-loss prevention system called Cyberhaven, which is installed on every employee's company-provided computer. Using Cyberhaven, PrizePicks can track data and files, assess potential security breaches, and trace changes, downloads, uploads, and movement of files and data across its enterprise environment. PrizePicks employs security analysts to monitor Cyberhaven, triage alerts, and address potential data breaches.

- PrizePicks uses a platform called JumpCloud, which employs secure multi-factor authentication to grant PrizePicks' employees access to its Workspace, and such authorization is set to expire on regular intervals to ensure that all users are authenticated on an ongoing basis.

- PrizePicks requires its employees—including Huffman—to enter into Employment Covenants Agreements, including the Agreement at issue here, which contain, among other provisions, (1) the acknowledgement that the position is one "of trust and responsibility with access to Confidential Information (including trade secrets), and other confidential information concerning the technology, employees, customers and business methods and plans of the Company;" (2) the promise not to "use, disclose, transmit, copy, upload, download, or reverse engineer Confidential Information . . . , except as authorized by the Company;" (3) the promise not to retain or

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

disclose any confidential information after termination; and (4) the promise to return all company property, data, and materials upon termination of employment. PrizePicks also regularly reminds its employees, both verbally and in writing, of their obligations under the Agreement.

- PrizePicks requires mandatory security awareness training on an annual basis for all of its employees, including Huffman.

- PrizePicks maintains a Data Management Policy, which defines how data is identified, classified, labeled, and properly handled and protected in accordance with its importance to and potential impact on PrizePicks. Among the "Restricted" classification of documents—*i.e.*, the data that must be "safeguard[ed] in the most stringent manner"—is "strategic plans." Further, other types of documents that PrizePicks recognizes "may adversely affect" or pose a "risk to PrizePicks" include, but are not limited to, "Risk assessment reports," "Internal presentations," "Internal reports," "Insider information," "Unpublished marketing materials," and "Unpublished PrizePicks memos." PrizePicks' Data Management Policy's structures ensure that no trade secret information is exfiltrated to competitors or the public.

- PrizePicks maintains an Artificial Intelligence (AI) Policy, which sets forth the authorized use of AI to mitigate risk to PrizePicks. The AI Policy explains that employees must "[p]rioritize the confidentiality and integrity of company . . . data when using AI tools." The AI Policy explicitly refers to its Data Classification Policy (described in the prior bullet) and admonishes that employees shall not "input . . . sensitive data into private available AI models or unauthorized platforms." Notably, personal

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

ChatGPT use has not been approved or managed by PrizePicks' IT and security teams for use as an AI tool, and personal ChatGPT accounts retain chat history data, in violation of PrizePicks' "**zero-retention policy** for data inputted into publicly available AI models." (emphasis in original).

- PrizePicks' Code of Conduct, contained in the Employee Handbook, prohibits the "[m]ishandling, misuse, or disclosure outside the Company of the Company's confidential information or trade secrets without authorization."

- PrizePicks' Employee Handbook also contains a Confidential and Proprietary Company Information provision, which explains that disclosure of confidential information and trade secrets outside the company is prohibited.

**C.    In Consideration for a Guaranteed Percentage Bonus, Huffman Agreed to a Reasonable Noncompete Covenant, Post-Employment Disclosure Covenant, and Return of Company Property Covenant in the Agreement.**

21.    On May 15, 2024, Huffman voluntarily accepted a guaranteed bonus percentage, which was conditioned upon his agreement to the terms and conditions in his Agreement, including certain restrictive covenants. The guaranteed bonus percentage was not a condition of employment, and he was free to reject it.

22.    Huffman further acknowledged and agreed to not work for a competitor in a similar capacity as his position at PrizePicks or take on responsibilities that would share PrizePicks' confidential information with a competitor for a period of one year after his termination of employment with PrizePicks:

**Non-Competition**. During the Restricted Period, You will not, directly or by assisting or directing others, on Your own behalf or on behalf of any

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

9

Competing Business, within the Territory: (i) engage in the Business in any capacity similar or corresponding to the capacity or capacities, in which You are employed or engaged by the Company or supervised for the Company during the Look Back Period; or (ii) take on any other responsibilities for a Competing Business within the Territory that would involve the probable use or disclosure of Confidential Information or the conversion of VIP Customers to the benefit of a Competing Business or detriment of the Company.

Ex. A ¶ 5.

23.     The Agreement defines "Business" as "the business of SizePrize [sic] LLC, d/b/a PrizePicks which includes daily fantasy sports games" and "Competing Business" as "any other person, firm, corporation, or entity engaged in the Business." Ex. A, App. A, Definitions.

24.     Huffman also agreed to provide a copy of the Agreement to entities he works for as an employee and agreed to provide information to PrizePicks about any company he works for in the one-year period after his employment terminated with PrizePicks:

**Post-Employment Disclosure**. During the Restricted Period, You shall provide a copy of this Agreement to persons and/or entities for whom You work or consult as an owner, lender, partner, joint venturer, employee or independent contractor. If, during the Restricted Period, You work or consult for another person or entity as an owner, lender, partner, joint venturer, employee or independent contractor, You shall provide the Company with such person or entity's name, the nature of such person or entity's business, Your job title, and a general description of the services You will provide, and

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

You hereby consent to the notification of such person or entity by the Company of Your rights and obligations under this Agreement.

Ex. A ¶ 10.

25.     Upon the termination of his employment, Huffman further agreed to return the Company's property and materials including, "confidential and proprietary lists (including, but not limited to consumer, supplier, licensor, and client lists), rolodexes, . . . computer files, marketing and sales materials, and any other property, record, document, or piece of equipment belonging to the Company."  Ex. A ¶ 24.  Huffman agreed to not "retain any copies of the Company's property, including any copies existing in electronic form, which are in Your possession or control."  *Id.*

26.     Huffman agreed that if he breached or threatened to breach "any portion of this Agreement," "the Company may seek temporary and permanent injunctive relief, in addition to any other legal or equitable remedies that may be awarded by a court of competent jurisdiction or an arbitrator."  *Id.* ¶ 11.  Huffman also agreed that in the event of litigation relating to the Agreement, the Company as a prevailing party is "entitled to recover attorneys' fees and costs of litigation in addition to all other remedies available at law or in equity."  *Id.* ¶ 14.

**D.     Huffman Misappropriated PrizePicks' Trade Secrets, Accepted Employment with DraftKings in Violation of the Agreement, Repeatedly Lied to PrizePicks' Management, and Destroyed Evidence.**

27.     On or around March 24, 2025, unbeknownst to PrizePicks, DraftKings sent an offer letter to Huffman for a full-time employee position as "Director, Social Media & Community," with an anticipated start date of April 21, 2025, and a salary of $200,000 plus bonus eligibility.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

11

28.    On or around March 27, 2025, Huffman met with one of PrizePicks' Human Resources Business Partners, during which he disclosed that he had received an offer from an unidentified competitor but claimed that he was not going to accept it nor attempt to use it as leverage to demand a bigger salary at PrizePicks.

29.    Shortly after receiving his DraftKings offer, Huffman uploaded his PrizePicks Agreement to ChatGPT and, upon information and belief, asked ChatGPT to analyze the enforceability of the non-compete and other covenants contained therein. This action shows that Huffman was keenly aware of his obligations under the Agreement and demonstrates his willful violation of the same.

30.    Shortly after receiving his DraftKings offer, Huffman began surreptitiously uploading highly sensitive PrizePicks documents to his *personal* ChatGPT account in violation of PrizePicks' policies, including its Data Management Policy and AI Policy.

31.    Specifically, on April 10, 2025, Huffman uploaded a highly sensitive strategic brand planning document (the "Brand Planning Document") to his personal ChatGPT account.  This document is a highly confidential and sensitive trade secret document because it contained detailed market research and analyses concerning PrizePicks' current brand, market share, active users, consumer demographics, areas of opportunity and growth, and future branding plans.  The document was the culmination of an immense amount of time, money, and other resources expended on market research, focus groups, internal business intelligence, data analytics and strategic analysis.  Put simply, the Brand Planning Document is among the most sensitive type of documents for future planning and growth that exist in the marketing arm of the company.

32.    The next day, April 11, 2025, Huffman uploaded another highly sensitive strategic planning document titled "2025 Team Goals" (the "Team Goals Document") to his personal ChatGPT account.  This document contains the goals of the entire PrizePicks

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

12

marketing organization, including efforts to expand its business. It also includes highly confidential metric goals, strategies, and user growth metrics. Like the Brand Planning Document, a competitor's possession of the Team Goals Document would be severely harmful to PrizePicks' competitive advantage.

33. In addition to violating PrizePicks' policies by uploading the Brand Planning Document and the Team Goals Document, upon information and belief, Huffman's uploads amounted to public disclosure of PrizePicks' highly sensitive trade secrets, likely amounted to public disclosure of PrizePicks' highly sensitive trade secrets, as those documents were fed into Huffman's personal ChatGPT account and PrizePicks is unable to determine how ChatGPT used this information.

34. Moreover, upon information and belief, Huffman retains access to these highly sensitive trade secret documents to this day, since he still retains access to his personal ChatGPT chat and upload history.

35. On May 2, 2025, unbeknownst to PrizePicks, Huffman accepted a revised offer from DraftKings, including a salary of $210,000 plus bonus eligibility—a $10,000 increase over his original offer.

36. Upon information and belief, Huffman had been in negotiations with DraftKings between his original offer in March and his final offer in May, during which time he misappropriated PrizePicks' trade secrets, including but not limited to the Brand Planning Document and the Team Goals Document, for DraftKings' benefit and to secure a more favorable compensation package.

37. The DraftKings offer letter that Huffman signed states, "Our offer and your employment are contingent upon your representation that you are not bound by the terms of any agreement with any previous employer that restricts your ability to accept this position or the performance of your duties for us." By signing the offer letter, Huffman

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

knowingly lied to DraftKings about his being bound by the PrizePicks Agreement and accepted the job under false pretenses.

38.    On May 5, 2025, Huffman resigned his employment with PrizePicks by emailing his supervisor and Senior Director of Marketing, Caitlin Schneider.

39.    On May 6, 2025, Schneider met with Huffman to discuss his resignation. At this meeting, Schneider asked Huffman about where he intended to work, and Huffman declined to answer.  Schneider asked Huffman if he was going to work for a competitor, and Huffman became upset and stated he was not required to disclose where he was going to work.  Schneider asked if Huffman would confirm or deny whether he was going to a competitor and he refused to answer.

40.    On May 7, 2025, Huffman met with Mike Quigley, Chief Marketing Officer at PrizePicks.  At this meeting, Quigley asked Huffman where Huffman planned to go after his employment with PrizePicks, and Huffman blatantly lied, claiming he had not made a final decision about his employment plans.

41.    Mike Ybarra, CEO of PrizePicks, also met with Huffman.  At this meeting, Huffman falsely represented that he had no future employment plans.

42.    Adam Wexler, Founder and Executive Chair of PrizePicks, also spoke with Huffman over the phone.  During this call, Huffman falsely claimed he would not be joining a competitor.

43.    Huffman repeatedly lied or withheld key information from PrizePicks to hide his future employment with DraftKings from PrizePicks' management.

44.    Huffman's last day of employment with PrizePicks was May 16, 2025.

45.    At or around the last day of his employment with PrizePicks, Huffman returned his Company-issued laptop computer and mobile telephone.  Through preliminary forensic inspection of the devices, PrizePicks has discovered that Huffman

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

14

surgically deleted volumes of information from the devices, including, but not limited to, text messages, downloads, browsing histories, and related data and information that would have shed light on his wrongdoing.

46.    On June 2, 2025, Huffman publicly posted on his LinkedIn profile that he had accepted and started a job at DraftKings as its "Director of Social & Community (Sportsbook)," a position with an almost identical name and, upon information and belief, substantially similar job duties as his position at PrizePicks.  In his post, he said, "I'm thrilled to have the opportunity to collaborate and take [DraftKings'] social presence to the next level."

47.    Upon information and belief, Huffman violated the Agreement's post-employment disclosure requirements that he provide a copy of the Agreement to DraftKings.

48.    Huffman also violated the Agreement's requirement that he inform PrizePicks of his job title, nature of employment, and nature of his work at DraftKings.

49.    Upon information and belief, by retaining PrizePicks' trade secrets on his personal ChatGPT account and destroying Company-owned data that resided on his PrizePicks-issued laptop and phone, Huffman has violated the Agreement's requirement to return company property and materials upon his termination from PrizePicks and the Agreement's confidentiality provisions.

50.    Huffman has also violated the Agreement's noncompete covenant by accepting employment with competitor DraftKings in a similar capacity as his position at PrizePicks and/or taking on responsibilities that would involve sharing PrizePicks' confidential information with competitor DraftKings.

51.    Upon information and belief, Huffman had already been and continued to surreptitiously misappropriate PrizePicks' trade secret information through various

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

means, including but not limited to downloading them onto storage devices, uploading them to personal AI and cloud storage accounts, and memorizing them, during his employment.

52.    Upon information and belief, Huffman has violated the DTSA by actively misappropriating and disclosing PrizePicks' trade secrets, including but not limited to those that Huffman impermissibly uploaded to his personal ChatGPT account (and potentially others contained on his Company-issued laptop and mobile phone). Huffman is also leveraging his experience at PrizePicks, the investments PrizePicks made into Huffman, and his access to and intimate knowledge of PrizePicks' confidential and trade secret information to unfairly compete with PrizePicks and damage its reputation, goodwill, and business relationships.

53.    As shown below, due to Huffman's flagrant violation of the DTSA and of the Agreement's covenants, PrizePicks is entitled to damages and injunctive relief to prevent further irreparable harm to PrizePicks.

## COUNT I - VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C § 1836

54.    PrizePicks realleges and incorporates herein by reference paragraphs 1 through 53 as if fully set forth herein.

55.    All the trade secret information that Huffman misappropriated and/or still possesses (whether it be physically, digitally, or in his memory), including but not limited to the Brand Planning Document and the Team Goals Document, is referred to herein as "PrizePicks Trade Secrets."

56.    The PrizePicks Trade Secrets amount to valuable trade secrets owned by PrizePicks.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

57.    The PrizePicks Trade Secrets constitute trade secrets under the DTSA because they include PrizePicks' confidential and proprietary competitive information, including but not limited to organizational goals, marketing priorities and strategies, social media analytics, team targets, goals, customer communication, competitive strategies, regulatory planning, and brand planning, all of which are kept secret are not commonly or generally known to the public, including, for example, PrizePicks' competitors and other third parties. 18 U.S.C. § 1839(3).

58.    PrizePicks has expended substantial resources in developing and safeguarding its Trade Secrets for its exclusive benefit, and the information provides PrizePicks with an advantage over its competitors, like DraftKing. The PrizePicks Trade Secrets derive independent economic value from the fact that they are neither generally known nor readily ascertainable by proper means by PrizePicks' competitors, customers and others. 18 U.S.C. § 1839(3)(A)-(B).

59.    PrizePicks has gone to great lengths to maintain the secrecy of the PrizePicks Trade Secrets, including, but not limited to, limiting access to them, employing a data-loss prevention system, employing a multi-factor authentication system, requiring its employees to enter into confidentiality agreements, requiring its employees to attend mandatory security awareness training, maintaining data management and artificial intelligence policies, and maintaining policies in its Employee Handbook prohibiting the use or disclosure of confidential information.

60.    Huffman acquired the PrizePicks Trade Secrets while employed by PrizePicks by virtue of his position as Director of Social Media, and he was under a duty to maintain the secrecy of the information and limit the use of the information.

61.    PrizePicks never consent to the disclosure or use of the PrizePicks Trade Secrets, and Huffman obtained personal possession of them by improper means—*i.e.*,

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

17

surreptitiously uploading them into his personal ChatGPT account in violation of PrizePicks' policies.

62.    Huffman has improperly disclosed and used, and, upon information and belief, is continuing to improperly disclose and use, the PrizePicks Trade Secrets in connection with his employment at DraftKings, and for the wrongful and deliberate purpose of helping DraftKings unfairly compete against PrizePicks and negotiating a better compensation package for himself.

63.    Such disclosure and use are occurring without the express or implied consent of PrizePicks.

64.    Huffman's acquisition, disclosure, and/or use of the PrizePicks Trade Secrets amounts to a deliberate and improper misappropriation of the PrizePicks Trade Secrets in violation of the DTSA.  18 U.S.C. § 1839(5).

65.    Huffman's employment with DraftKings will result in the disclosure of the confidential information and Trade Secrets of PrizePicks by virtue of Huffman's role and responsibilities with DraftKings. Such disclosure will benefit Huffman and DraftKings, and violates the DTSA, 18 U.S.C. § 1836 et seq.

66.    As a result of Huffman's actual and threatened misappropriation of the PrizePicks Trade Secrets, PrizePicks is suffering immediate, ongoing, and irreparable harm.  Without immediate and permanent injunctive relief, PrizePicks will continue to sustain irreparable harm for which there is no adequate remedy at law.  18 U.S.C. § 1836(b)(3)(A).

67.    Alternatively, PrizePicks is entitled to an award of damages under 18 U.S.C. § 1836(b)(3)(B) including damages sustained from Huffman's misappropriation of the PrizePicks Trade Secrets, or the actual loss to PrizePicks.

COMPLAINT FOR INJUNCTIVE                         KABAT CHAPMAN & OZMER LLP
AND OTHER RELIEF                                 171 17TH ST NW, SUITE 1550
                                                 ATLANTA, GA 30363
                                                 (404) 400-7300

68.     Huffman's misappropriation and disclosure of PrizePicks' Trade Secrets to DraftKings, a competitor, were intentional, deliberate, and calculated and therefore willful and malicious, especially considering Huffman's destruction of evidence. PrizePicks is entitled to attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D), and an award of exemplary damages equal to twice its actual damages pursuant to 18 U.S.C. § 1836(b)(3)(C). Huffman was expressly notified of the DTSA's "safe harbor" provisions in the 2024 (p. 18) and 2025 (p. 17) versions of the PrizePicks Employee Handbook such that PrizePicks may pursue exemplary damages and attorneys' fees against Huffman.

## COUNT II – BREACH OF CONTRACT (NON-COMPETE)

69.     PrizePicks realleges and incorporates herein by reference paragraphs 1 through 68 as if fully set forth herein.

70.     The Agreement is a valid and binding contract between PrizePicks and Huffman.

71.     In the Agreement, Huffman promised that he would not, for a period of one year following the termination of his employment with PrizePicks, work for a competitor in a similar capacity as his position at PrizePicks or take on responsibilities that would share PrizePicks' confidential information with a competitor. Ex. A ¶ 5.

72.     Huffman earned over $125,000 per year, far more than the statutory minimum necessary to enforce the noncompete.

73.     Huffman received sufficient additional and independent consideration to support the noncompete covenant in the form of, among other things, bonus compensation. *See id.* preamble, ¶ 23.

74.     The noncompete covenant is reasonable as it is necessary for the protection of PrizePicks' trade secrets, confidential information, business, and goodwill.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

75.    The noncompete covenant is reasonable because it imposes no greater restraint on Huffman than is reasonably necessary to secure PrizePicks' legitimate interests in protecting its trade secrets, confidential information, business, and goodwill.

76.    Enforcement of the noncompete will not result in any injury to the public of the loss Huffman's service and skill such that nonenforcement would be warranted.

77.    Huffman has started his role as Director of Social & Community (Sportsbook) at DraftKings in competition with PrizePicks.

78.    Huffman has breached the Agreement's noncompete covenant. *Id.*

79.    Huffman's breach of the Agreement's noncompete covenant will cause irreparable harm to PrizePicks and should therefore be enjoined as expressly authorized by the terms of the Agreement.

80.    In the alternative, if Huffman is allowed to breach the noncompete covenant of the Agreement, PrizePicks has sustained and will continue to sustain damages as a proximate cause of Huffman's breach of his contractual obligations. Huffman is liable to PrizePicks for monetary damages, including but not limited to costs and attorneys' fees, in an amount to be determined at trial pursuant to Paragraph 14 of the Agreement.

## COUNT III – BREACH OF CONTRACT (POST-EMPLOYMENT DISCLOSURE)

81.    PrizePicks realleges and incorporates herein by reference paragraphs 1 through 80 as if fully set forth herein.

82.    The Agreement is a valid and binding contract between PrizePicks and Huffman.

83.    As a condition of the Agreement, Huffman entered into a valid and binding post-employment disclosure covenant with PrizePicks promising that he would provide

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

20

a copy of the Agreement to DraftKings and inform PrizePicks of his job title, nature of employment, and nature of his work at DraftKings.  Ex. A ¶ 10.

84.  By lying and refusing to answer whether he made a final decision about his post-PrizePicks employment plans, Huffman never informed PrizePicks of his job title, nature of employment, and nature of his work at DraftKings.

85.  Upon information and belief, Huffman has not provided DraftKings a copy of the Agreement.

86.  Huffman has breached the Agreement's post-employment disclosure covenant.  *Id.*

87.  PrizePicks has sustained and will continue to sustain damages as a proximate cause of Huffman's breach of his contractual obligations. Huffman is liable to PrizePicks for monetary damages, including but not limited to costs and attorneys' fees, in an amount to be determined at trial pursuant to Paragraph 14 of the Agreement.

## COUNT IV – BREACH OF CONTRACT (RETURN OF PROPERTY)

88.  PrizePicks realleges and incorporates herein by reference paragraphs 1 through 87 as if fully set forth herein.

89.  The Agreement is a valid and binding contract between PrizePicks and Huffman.

90.  In the Agreement, Huffman agreed to, upon the termination of his employment, return the Company's property and materials including, "confidential and proprietary lists (including, but not limited to consumer, supplier, licensor, and client lists), rolodexes, . . . computer files, marketing and sales materials, and any other property, record, document, or piece of equipment belonging to the Company."  Ex. A ¶ 24. Huffman agreed to not "retain any copies of the Company's property, including any copies existing in electronic form, which are in Your possession or control."  *Id.*

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

21

91.     While employed by PrizePicks, Huffman uploaded confidential documents, including but not limited to the Brand Planning Document and Team Goals Document, to his personal ChatGPT account.

92.     Upon information and belief, Huffman still retains copies of these proprietary documents in his personal possession and on his personal ChatGPT account.

93.     Huffman has not returned these documents, and/or any copies of these documents, to PrizePicks.

94.     By failing to return these documents, Huffman has breached the Agreement's return of company property and materials provision. *Id.*

95.     Huffman's breach has caused, and is continuing to cause, irreparable harm to PrizePicks' business, including its confidential information, goodwill, reputation, customer relationships, and other business interest.

96.     PrizePicks has sustained and will continue to sustain damages as a proximate cause of Huffman's breach of his contractual obligations.  Huffman is liable to PrizePicks for monetary damages, including but not limited to costs and attorneys' fees, in an amount to be determined at trial pursuant to Paragraph 14 of the Agreement.

## COUNT V – BREACH OF CONTRACT (CONFIDENTIAL INFORMATION)

97.     PrizePicks realleges and incorporates herein by reference paragraphs 1 through 96 as if fully set forth herein.

98.     The Agreement is a valid and binding contract between PrizePicks and Huffman.

99.     In the Agreement, Huffman agreed not to use, disclose, transmit, copy, download, or reverse engineer confidential information unless authorized by PrizePicks, not retain or disclose confidential information after termination, and promised to return all property, data, and materials upon termination of employment with PrizePicks.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

100.    While employed by PrizePicks, Huffman uploaded confidential documents, including but not limited to the Brand Planning Document and Team Goals Document, to his personal ChatGPT account.

101.    Upon information and belief, Huffman still retains copies of these confidential, proprietary, and trade secret documents in his personal possession and on his personal ChatGPT account.

102.    Huffman has not returned these documents, and/or copies of these documents, to PrizePicks.

103.    By failing to return these documents, Huffman has breached the Agreement's confidentiality provisions.

104.    Huffman's breach has caused, and is continuing to cause, irreparable injury to PrizePicks' business by virtue of the disclosure of its confidential information and irreparable injury to its goodwill, reputation, customer relationships, and other business interests.

105.    In the alternative, PrizePicks has sustained and will continue to sustain damages as a proximate cause of Huffman's breach of his contractual obligations. Huffman is liable to PrizePicks for monetary damages, including but not limited to costs and attorneys' fees, in an amount to be determined at trial pursuant to Paragraph 14 of the Agreement.

## <u>COUNT VI – BREACH OF FIDUCIARY DUTY</u>

106.    PrizePicks realleges and incorporates herein by reference paragraphs 1 through 105 as if fully set forth herein.

107.    During his employment with PrizePicks, Huffman owed a fiduciary duty of loyalty to PrizePicks.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

108.    Huffman breached his duty of loyalty by acting contrary to PrizePicks' interests by taking confidential, proprietary, or trade secret information from PrizePicks without authorization, and further breached his fiduciary duties owed to PrizePicks by, upon information and belief, using such information for the benefit of his new employer, DraftKings, and for his own benefit in negotiating a better compensation package.

109.    Huffman's breach has caused, and is continuing to cause, irreparable injury to PrizePicks' business, including its irreparable injury by virtue of the disclosure of its confidential information and irreparable injury to its goodwill, reputation, customer relationships, and other business interests.

110.    Alternatively, as a proximate cause of Huffman's breaches of his duty of loyalty, PrizePicks has sustained and will continue to sustain damages, and Huffman is liable to PrizePicks for monetary damages, including but not limited to costs and attorneys' fees, in an amount to be determined at trial.

## COUNT VII – TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF

111.    PrizePicks realleges and incorporates herein by reference paragraphs 1 through 110 as if fully set forth herein.

112.    PrizePicks and Huffman entered into the Agreement, which, among other covenants, prohibits Huffman for one year from working for a competitor in any capacity similar or corresponding to the capacity he was employed by PrizePicks, taking confidential, proprietary, or trade secret information from PrizePicks, and using such information in any way that could harm PrizePicks or its business interests or benefit a competitor, retaining PrizePicks' property.

113.    Huffman has violated the Agreement by working for a competitor in a capacity similar or corresponding to the capacity he was employed by PrizePicks, taking confidential, proprietary, or trade secret information from PrizePicks, and using such

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

information in any way that has harmed and will harm PrizePicks and its business interests or that has benefitted a competitor.

114.    Huffman's violations of the Agreement have caused and will cause PrizePicks irreparable and immediate injury, loss, and damage, for which PrizePicks has no adequate remedy at law.

115.    Unless Huffman is temporarily and preliminarily enjoined and restrained, there is an immediate, substantial threat that he will continue to violate the restrictive covenants contained in the Agreement causing further irreparable injury to PrizePicks.

116.    There is a substantial likelihood that PrizePicks will prevail on the merits of the dispute given that the restrictive covenants contained in the Agreement are enforceable under Washington law.  Huffman earned far more than the minimum salary threshold required to enforce noncompetition covenants and received independent consideration in the form of bonus compensation, among other things, in exchange for signing the Agreement.  The scopes of geographic and temporal restrictions of the noncompete covenant are reasonable for the protection of PrizePicks' legitimate business interests.  The noncompete covenant is also reasonable as it is necessary for the protection of PrizePicks' trade secrets, confidential information, business, and goodwill, it imposes no greater restraint on Huffman than is reasonably necessary to secure PrizePicks' legitimate interests in protecting its trade secrets, confidential information, business, and goodwill, and enforcement of the noncompete will not result in any injury to the public of the loss Huffman's service and skill such that nonenforcement would be warranted.

117.    There is substantial likelihood that PrizePicks will prevail on the merits of the dispute given that Huffman breached the DTSA.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

25

118.    The threatened harm to PrizePicks without an injunction prohibiting Huffman from committing further breaches of the Agreement and misappropriating PrizePicks' Trade Secrets far outweighs any potential harm to Huffman if he is enjoined.

119.    Enjoining Huffman from further breaching the Agreements, working for a competitor, and misappropriating PrizePicks' Trade Secrets will not be adverse to the public interest.

120.    Accordingly, PrizePicks is entitled to damages for harm already caused, and for injunctive relief to prevent further harm to PrizePicks.

## **PRAYER FOR RELIEF**

PrizePicks prays for the following relief:

(a)    Judgment in favor of PrizePicks and against Huffman on all of PrizePicks' claims;

(b)    A temporary restraining order, a preliminary injunction pending final adjudication of this matter, and a permanent injunction preventing Huffman from:

(1)    using, disclosing, and misappropriating the PrizePicks Trade Secrets under 18 U.S.C. §§ 1835, 1836(b)(3)(A);

(2)    working for DraftKings, PrizePicks' competitor, or any other competitors of PrizePicks that provide DFS products for a period of one year from the date of his termination of employment with PrizePicks excluding any amount of time Huffman was in breach of the noncompetition provisions of the Agreement;

(3)    using, disclosing, or misappropriating PrizePicks' confidential information that does not rise to the level of a trade secret.

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

26

(4)    taking any further action that would violate the restrictive covenants contained in the Agreement;

(c)    Reasonable attorneys' fees pursuant to the Agreement;

(d)    Reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D) for willful and malicious misappropriation;

(e)    Actual damages under 18 U.S.C. § 1836(b)(i)(I);

(f)    Exemplary double damages under 18 U.S.C. § 1836(b)(3)(C) for willful and malicious misappropriation;

(g)    Pre-judgment and post-judgment interest on any amounts awarded;

(h)    Costs and expenses; and

(i)    Any other such other and further relief as the Court deems just and appropriate under the circumstances.

Dated: June 11, 2025.

**KABAT CHAPMAN & OZMER LLP**

 /s/ *Aaron Wagner*
Aaron Wagner
Washington Bar No. 51905
awagner@kcozlaw.com
Nathan D. Chapman (*pro hac vice* forthcoming)
Georgia Bar No. 244954
nchapman@kcozlaw.com
Chadwick L. Williams (*pro hac vice* forthcoming)
Georgia Bar No. 161149
cwilliams@kcozlaw.com
171 17th Street NW
Suite 1550
Atlanta, GA 30363
Phone: (404) 400-7300
Facsimile: (404) 400-7300

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

27

**BOATLAW, LLP**

DOUGLAS R. WILLIAMS,
Washington Bar No. 43823
doug@boatlaw.com
21 Bellwether Way
Suite 104
Bellingham, WA 98225
Phone: 360-671-6711
Facsimile: 360-647-2943

*Attorneys for PrizePicks*

COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF

KABAT CHAPMAN & OZMER LLP
171 17TH ST NW, SUITE 1550
ATLANTA, GA 30363
(404) 400-7300

28

# Exhibit A

## EMPLOYMENT COVENANTS AGREEMENT

This **EMPLOYMENT COVENANTS AGREEMENT** (the "Agreement") is entered into between **SidePrize LLC, d/b/a PrizePicks** (the "Company") and **Judah Huffman** ("You" or "Your") (collectively, the "Parties").

For and in consideration of the Company's agreement to employ or continue to employ You, the compensation and benefits received as a result thereof, other consideration as set forth in the Agreement, and the mutual promises and representations of the Parties made herein, the Parties agree to the following terms:

1.      Acknowledgments.  You acknowledge and agree that:

(a)      Your position is a position of trust and responsibility with access to Confidential Information (including trade secrets), and other confidential information concerning the technology, employees, customers and business methods and plans of the Company, and the Company will invest its time and money in the development of Your skills in the Business;

(b)      the Confidential Information, and the relationship between the Company and each of its employees and customers, are valuable assets of the Company which may not be used for any purpose other than the Company's Business, and the Company would not provide You with access to the foregoing if You were not willing to enter into and abide by the terms of this Agreement;

(c)      the restrictions contained in this Agreement, including, but not limited to, the restrictive covenants set forth in Sections 2 – 7 below, are reasonable and necessary to protect the legitimate business interests of the Company, and they will not impair or infringe upon Your right to work or earn a living when Your employment with the Company ends;

(d)      portions of this Agreement may be modified or overridden by the laws of the state in which you reside, and these modifications or overrides are set forth in Appendix B hereto which You will read before signing this Agreement. In addition to what is stated in Appendix B, You understand that under no circumstances will the Non-Solicitation of VIP Customers, Non-Recruit of Employees or the Non-Competition obligations in Sections 3 through 5 apply in California; and

(e)      unless otherwise indicated, all capitalized terms used in this Agreement are defined in the "Definitions" Section of Appendix A.  Appendices A and B are incorporated by reference and are included in the definition of "Agreement."

2.      Confidential Information.

(a)      You represent and warrant that:

(i)      You are not subject to any legal or contractual duty or agreement that would prevent or prohibit You from performing Your duties for the Company or complying with this Agreement, including any duties you may have with respect to soliciting new employees or new customers to the Company; and

(ii)      You are not in breach of any legal or contractual duty or agreement, including any agreement concerning trade secrets or confidential information, owned by any other person or entity.

(b)      You agree that You will not:

(i)      during Your employment and for so long thereafter as such information qualifies as Confidential Information, use, disclose, transmit, copy, upload, download, or reverse engineer Confidential Information for any purpose other than the Company's Business, except as authorized in writing by the Company;

(ii)      during Your employment and for so long thereafter as such information qualifies as Confidential Information, You will not divulge or make accessible to any person or entity (i) the names of any of the Company's customers, or (ii) any information contained in any of the Company's customers' accounts;

(iii)      during Your employment with the Company, use, disclose, or reverse engineer (a) any confidential information (including trade secrets) of any former employer or third party, or (b) any works of authorship developed in whole or in part by You during any former employment or for any other party, unless authorized in writing by the former employer or third party; or

(iv)      upon the termination of Your employment for any reason, (a) retain physical embodiments of Confidential Information, including any copies existing in any form (including electronic form) which are in Your possession or control, or (b) destroy, delete, or alter the Confidential Information without the Company's prior written consent.

(c)      The obligations under this Agreement shall remain in effect as long as such information remains Confidential Information. However, if required by applicable law, the obligations in Sections 2 (b)(i) and (ii) will only

apply for three (3) years after the end of Your employment with the Company, where information that does not qualify as a trade secret is concerned; however, the restrictions will continue to apply to trade secret information for as long as the information at issue remains qualified as a trade secret under applicable law.

(d)    The confidentiality, property, and proprietary rights protections available in this Agreement are in addition to, and not exclusive of, any and all other rights to which the Company is entitled under federal and state law, including, but not limited to, rights provided under copyright laws, trade secret and confidential information laws, and laws concerning fiduciary duties. The obligations in Section 2(b)(i) and (ii) shall not be construed to prohibit the use of general knowledge and experience customarily relied upon in Your trade or profession that is not specific to the particular business matters of the Company (such as its business transactions, customers, employees, or products (existing or under development)),

3.    Non-Solicitation of VIP Customers.  During the Restricted Period, You will not, directly or by assisting or directing others: (i) solicit any VIP Customer of the Company for the purpose of selling or providing any products or services competitive with the Business (e.g., fantasy sports, sports betting, sports entertainment, casinos and lotteries); (ii) induce any VIP Customer to reduce or cease their business with the Company; (iii) or otherwise divert any VIP Customer from doing business with the Company.  The restrictions set forth in this Section 3 apply only to VIP Customers with whom You had Material Contact.  Nothing in this Section 3 shall be construed to prohibit You from soliciting any VIP Customer of the Company for the purpose of selling or providing any products or services competitive with the Business: which product line or service line the Company no longer offers.  In addition, nothing in this Section 3 shall restrict You from accepting business from a VIP Customer so long as You did not solicit, assist in soliciting, facilitate the solicitation of, provide, or offer to provide services to the VIP Customer (regardless of who first initiated contact) or use Confidential Information to encourage or induce the VIP Customer to withdraw, curtail or cancel its business with the Company or in any other manner modify or fail to enter into any actual or potential business relationship with the Company.

4.    Non-Recruitment of Employees.  During the Restricted Period, You will not, directly or by assisting or directing others, within the Territory: (i) solicit, or attempt to solicit, any Restricted Employee with whom You had Material Contact to (x) terminate his or her employment relationship with the Company, or (y) work for any Competing Business; or (ii) on behalf of any Competing Business, recruit or induce, or assist with recruiting or

inducing, any Restricted Employee to become employed by a Competing Business.

5.    Non-Competition.  During the Restricted Period, You will not, directly or by assisting or directing others, on Your own behalf or on behalf of any Competing Business, within the Territory: (i) engage in the Business in any capacity similar or corresponding to the capacity or capacities, in which You are employed or engaged by the Company or supervised for the Company during the Look Back Period; or (ii) take on any other responsibilities for a Competing Business within the Territory that would involve the probable use or disclosure of Confidential Information or the conversion of VIP Customers to the benefit of a Competing Business or detriment of the Company.

6.    Duty of Loyalty.  You agree that during the period of Your employment by the Company You will not, without the Company's express written consent, directly or indirectly engage in any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, Your employment by the Company.

7.    Work Product.  Your employment duties may include inventing in areas directly or indirectly related to the Business of the Company or to a line of business that the Company may reasonably be interested in pursuing.  All Work Product shall constitute work made for hire.  If (i) any of the Work Product may not be considered work made for hire, or (ii) ownership of all right, title, and interest in and to the Work Product will not vest exclusively in the Company, then, without further consideration, You assign all presently-existing Work Product to the Company, and agree to assign, and automatically assign, all future Work Product to the Company.

The Company will have the right to obtain and hold in its own name copyrights, patents, design registrations and continuations thereof, proprietary database rights, trademarks, rights of publicity, and any other protection available in the Work Product.  At the Company's request, You agree to perform, during or after Your employment with the Company, any acts to transfer, perfect and defend the Company's ownership of the Work Product, including, but not limited to: (i) executing all documents (including a formal assignment to the Company) for filing an application or registration for protection of the Work Product (an "Application"), (ii) explaining the nature of the Work Product to persons designated by the Company, (iii) reviewing Applications and other related papers, or (iv) providing any other assistance reasonably required for the orderly prosecution of Applications.

In the event the Company is unable for any reason, after reasonable effort, to secure Your signature on any document needed in connection with the actions specified

in the preceding paragraph, You hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as Your agent and attorney in fact, which appointment is coupled with an interest, to act for and in Your behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by You.  You hereby waive and quitclaim to the Company any and all claims, of any nature whatsoever, which You now or may hereafter have for infringement of any Work Product assigned hereunder to the Company.

Upon the Company's request and in connection with the termination of Your employment with the Company, You agree to provide the Company with a written description of any Work Product in which You are involved (solely or jointly with others) and the circumstances surrounding the creation of such Work Product.

8.      License. During Your employment and after Your employment with the Company ends, You grant to the Company an irrevocable, nonexclusive, worldwide, royalty-free, fully-paid, perpetual license (with the right to sublicense through multiple tiers of sublicensees) to:  (i) make, use, sell, copy, publicly perform, display, distribute, modify or otherwise use copies of the Licensed Materials, (ii) prepare, use and distribute derivative works based upon the Licensed Materials, (iii) authorize others to do the same, and (iv) exercise any and all present and future rights set forth in clauses (i) through (iii) with respect to such Licensed Materials.  You shall notify the Company in writing of any Licensed Materials You deliver to the Company and will not incorporate, or permit to be incorporated, Licensed Materials into any Work Product.

9.      Release.  During Your employment and after Your employment with the Company ends, You consent to the Company's use of Your image, likeness, voice, or other characteristics in the Company's products or services. You release the Company from any cause of action which You have or may have arising out of the use, distribution, adaptation, reproduction, broadcast, or exhibition of such characteristics.  You represent that You have obtained, for the benefit of the Company, the same release in writing from all third parties whose characteristics are included in the services, materials, computer programs and other deliverables that You provide to the Company. Company shall at all times comply with its Privacy Policy (Privacy Policy (prizepicks.com)).

10.     Post-Employment Disclosure. During the Restricted Period, You shall provide a copy of this Agreement to persons and/or entities for whom You work or consult as an owner, lender, partner, joint venturer, employee or independent contractor.  If, during the

Restricted Period, You work or consult for another person or entity as an owner, lender, partner, joint venturer, employee or independent contractor, You shall provide the Company with such person or entity's name, the nature of such person or entity's business, Your job title, and a general description of the services You will provide, and You hereby consent to the notification of such person or entity by the Company of Your rights and obligations under this Agreement.

11.     Special Remedies. If You breach or threaten to breach any portion of this Agreement, You agree that the Company may seek temporary and permanent injunctive relief, in addition to any other legal or equitable remedies that may be awarded by a court of competent jurisdiction or an arbitrator. If You fail to comply with a restriction in this Agreement that applies for a limited period of time after employment, the time period for that restriction will be extended by the greater of either: one day for each day You are found to have violated the restriction, or the length of the legal proceeding necessary to secure enforcement of the restriction; provided, however, this extension of time shall be capped so that the extension of time does not exceed two years from the date Your employment ended, and if this extension would make the restriction unenforceable under applicable law it will not be applied ("Fairness Extension").

Nothing contained in this Agreement shall limit the Company's right to any other remedies at law or in equity.

12.     Independent Enforcement.  The covenants set forth in this Agreement shall be construed as agreements independent of (i) any other agreements, or (ii) any other provision in this Agreement, and the existence of any claim or cause of action by You against the Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either You or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of the covenants set forth in this Agreement.  The Company shall not be barred from enforcing the restrictive covenants set forth in this Agreement by reason of any breach of (i) any other part of this Agreement, or (ii) any other agreement with You.

13.     At-will Employment.  This Agreement does not create a contract of employment or a contract for benefits. Your employment relationship with the Company is at-will. This means that at either Your option or the Company's option, Your employment may be terminated at any time, with or without cause or notice.

14.     Attorneys' Fees.  In the event of litigation relating to this Agreement, the Company shall, if it is the prevailing party, be entitled to recover attorneys' fees and costs of

litigation in addition to all other remedies available at law or in equity. The Company shall be deemed the prevailing party, entitled to all of its reasonable attorneys' fees, costs and expenses, if it is awarded any part of the legal or equitable relief it seeks, irrespective of whether some of the relief it seeks is denied or modified. If under applicable law, the foregoing cannot be enforced without also giving You the right to recover attorneys' fees and costs if deemed the prevailing party, then the foregoing sentence shall not apply and both parties shall bear their own attorney's fees and costs instead.

15.    Waiver.   The Company's failure to enforce any provision of this Agreement shall not act as a waiver of that or any other provision. The Company's waiver of any breach of this Agreement shall not act as a waiver of any other breach.

16.    Severability.   The provisions of this Agreement are severable. If any provision is determined to be invalid, illegal, or unenforceable, in whole or in part, the remaining provisions and any partially enforceable provisions shall remain in full force and effect.  If any court of competent jurisdiction shall determine that the scope, time, or territorial restrictions set forth in this Agreement are unreasonable as applied to You, You and the Company acknowledge our intent that these restrictions be enforced to the fullest extent the court deems reasonable, and thereby, unless prohibited by law, request that they be reformed to that extent as applied to You.

17.    Governing Law.  The laws of the State of Georgia shall govern this Agreement.  If Georgia's conflict of law rules would apply another state's laws, the Parties agree that Georgia law shall still govern.

18.    No Strict Construction.  If there is a dispute about the language of this Agreement, the fact that one Party drafted the Agreement shall not be used in its interpretation.

19.    Entire Agreement.   This Agreement, including Appendices A and B which are incorporated by reference, constitutes the entire agreement between the Parties concerning the subject matter of this Agreement. This Agreement supersedes any prior communications, agreements or understandings, whether oral or written, between the Parties relating to the subject matter of this Agreement.

20.    Amendments.    This Agreement may not be amended or modified except in writing signed by both Parties.

21.    Successors and Assigns.  This Agreement shall be assignable to, and shall inure to the benefit of, the Company's successors and assigns, including, without limitation, successors through merger, name change, consolidation, or sale of a majority of the Company's stock or assets, and shall be binding upon You.  You shall not have the right to assign Your rights or obligations under this Agreement.  The covenants contained in this Agreement shall survive cessation of Your employment with the Company, regardless of who causes the cessation or the reason for the cessation.

22.    Consent to Jurisdiction and Venue.  You agree that any claim arising out of or relating to this Agreement shall be brought in a state or federal court of competent jurisdiction in Georgia.  You consent to the personal jurisdiction of the state and/or federal courts located in Georgia.  You waive (a) any objection to jurisdiction or venue, or (b) any defense claiming lack of jurisdiction or improper venue, in any action brought in such courts.

23.    Consideration.  Twenty percent (20%) of the maximum amount of bonus payments that You are eligible to receive under the terms of Your employment, for the next bonus payment cycle after You sign this Agreement, shall be set aside as consideration for this Agreement. For example, if You are eligible for up to $10,000 in bonuses, $2,000 of that eligibility shall be consideration for this Agreement and $8,000 shall remain eligible for bonus calculations.

24.    Return of Company Property/Materials.  Upon the termination of Your employment for any reason or upon the Company's request at any time, You shall immediately return to the Company all of the Company's property, including, but not limited to, keys, passcards, credit cards, confidential or proprietary lists (including, but not limited to, customer, supplier, licensor, and client lists), rolodexes, tapes, laptop computer, software, computer files, marketing and sales materials, and any other property, record, document, or piece of equipment belonging to the Company.  You will not (i) retain any copies of the Company's property, including any copies existing in electronic form, which are in Your possession or control, or (ii) destroy, delete, or alter any Company property, including, but not limited to, any files stored on a laptop computer, without the Company's prior written consent. The obligations contained in this Section shall also apply to any property which belongs to a third party, including, but not limited to, (i) any entity which is affiliated or related to the Company, or (ii) the Company's customers, licensors, or suppliers.

25.    Protected Conduct.  Nothing in this Agreement prohibits You  from (i) opposing an event  or conduct that You reasonably  believe is  a violation of  law, including

-4

criminal conduct, discrimination, harassment, retaliation, a safety or health violation, or other unlawful employment practices, (ii) disclosing sexual assault or sexual harassment; or (iii) reporting such an event or conduct to Your attorney, law enforcement, or the relevant law-enforcement agency (such as the Securities and Exchange Commission, Department of Labor, Occupational Safety and Health Administration, Equal Employment Opportunity Commission, the state division of human rights, or a local commission on human rights)**,** or (iv) making any truthful statements or disclosures required by law or otherwise cooperating in an investigation conducted by any government agency (collectively referred to as "Protected Conduct"). Further, nothing requires notice to or approval from the Company before engaging in such Protected Conduct. Nothing in this Agreement shall prohibit any non-management, non-supervisory employees from engaging in protected concerted activity under §7 of the NLRA or similar state law such as joining, assisting, or forming a union, bargaining, picketing, striking, or participating in other activity for mutual aid or protection, or refusing to do so; this includes using or disclosing information acquired through lawful means regarding wages, hours, benefits, or other terms and conditions of employment**,** except where the information was entrusted to the employee in confidence by the Company as part of the employee's job duties.

26.    <u>Execution</u>.  This Agreement may be executed in one or more counterparts, including by way of electronic transmission.  Each counterpart shall for all purposes be deemed to be an original, and each counterpart shall constitute this Agreement.

27.    <u>Effective Date</u>.  The effective date of this Agreement shall be the date signed by You below unless this Agreement is entered into as a condition of initial employment or promotion in which case the effective date is the first day of Your employment in that new position (whether reduced to writing on that date or not).

28.    **<u>Affirmation</u>.  You acknowledge that You have carefully read this Agreement, You know and understand its terms and conditions, and You have had the opportunity to ask the Company any questions You may have had prior to signing this Agreement and You have had the opportunity to seek the advice of independent legal counsel with respect to this Agreement.**

IN WITNESS WHEREOF, the Parties have signed this Employment Covenants Agreement as of the Effective Date**.**

<table>
<tr>
<td>

**SidePrize, LLC d/b/a PrizePicks**


By: _____*Adam Packer*_____

Name:    Adam Packer
Title:    SVP Legal & Compliance
Address: 1230 Peachtree St. NE, Suite 2800 Atlanta, GA 30309

</td>
<td>

┌ DocuSigned by:

*Judah Huffman*
└───────────────
Employee's Name: Judah Huffman
Employee's Address: **7702 196th Ave NE Redmond, WA 98053**

</td>
</tr>
</table>

**APPENDIX A**

**DEFINITIONS**

A.    "Business" shall mean the business of SizePrize LLC, d/b/a PrizePicks which includes daily fantasy sports games.

B.    "Competing Business" shall mean any other person, firm, corporation, or entity engaged in the Business.

C.    "Confidential Information" means the Company's data or information (or compilations of data or information) in any form (tangible or intangible) relating to the Company's Business, disclosed to You or of which You become aware due to your relationship with the Company, which has value to the Company, that the Company has not authorized public disclosure of, is not readily available to any persons outside of the Company through proper means. By way of example and not limitation, Confidential Information is understood to include trade secrets, computer programs, computer software, applications, operating systems, software design, web design, algorithms, codes, proprietary information, methods of operation, unpublished pricing information, and underlying pricing-related variables (such as costs, volume discounting options, and profit margins),, financial information, plans and projections, management evaluations of the Company's resources/assets (such as technology, real estate, and employee job performance), future business plans, information concerning the Company's or the third party's financial structure and methods and procedures of operation, the composition, description, schematic or design of products, future products or equipment plans of the Company or any third party, advertising or marketing plans, information regarding independent contractors, employees, clients, licensors, suppliers, customers, potential customers or any third party, including, but not limited to, customer lists compiled by the Company, names of customers, and customer information compiled by the Company (such as data analytics relating to the history of customer transactions, VIP lists), and other information related thereto. Confidential Information shall not include any information that (i) is or becomes generally available to the public other than as a result of an unauthorized disclosure by You or others, (ii) has been independently developed and disclosed by You or others without violating this Agreement or the legal rights of the Company, or (iii) otherwise enters the public domain through lawful means. Confidential Information also includes any information described in this paragraph that the Company obtains from another party and which the Company treats as proprietary or designates as confidential information, whether or not owned or developed by the Company. Customer lists and customer information which have been compiled by the Company represents a material investment of the Company's time and money.

D.    "Look Back Period" means the two year period preceding the termination of Your employment with the Company (or such shorter period of time as You are employed).

E.    "VIP Customer" means any person or entity to whom the Company has (i) sold its products or services, and who (ii) the Company has designated as a VIP in the last twelve (12) months of Your employment (or such shorter time as You are employed by the Company).

F.    "Restricted Employee" means any person who (i) is employed by the Company at the time Your employment with the Company ends, or (ii) was employed by the Company during the last year of Your employment with the Company (or during Your employment if employed less than a year).

G.    "Licensed Materials" means any materials that You use for the benefit of the Company, or deliver to the Company or the Company's customers, which (i) do not constitute Work Product, (ii) are created by You or of which You are otherwise in lawful possession, and (iii) You may lawfully use for the benefit of, or distribute to, the Company or the Company's customers.

H.    "Material Contact" means the contact between an employee and each customer or potential customer with whom or which the employee dealt on behalf of the company; whose dealings with the employer were coordinated or supervised by the employee; about whom the employee obtained confidential information in the ordinary course of business as a result of such employee's association with the employer; or who received products or services authorized by the employer, the sale or provision of which results or resulted in compensation, commissions, or earnings for the employee within two years prior to the date of the employee's termination.  With respect to Employees, Material Contact shall mean contact between You and an Employee with whom you had work-related interactions or whom you supervised.

I.    "Restricted Period" means the time period during Your employment with the Company, and the one (1) year after Your employment with the Company ends, regardless of the reason it ends.

J.      "Territory" means (i) each state in the United States in which the Company is engaged in its business at the time of Your separation from employment; (ii) each state in the United States in which You were working at the time of Your separation from employment; and (iii) the state in which you reside.

K.      "Work Product" means (a) any data, databases, materials, documentation, computer programs, inventions (whether or not patentable), designs, and/or works of authorship, including but not limited to, discoveries, ideas, concepts, properties, formulas, compositions, methods, programs, procedures, systems, techniques, products, improvements, innovations, writings, pictures, audio, video, images (including images of You), and artistic works, and (b) any subject matter protected under patent, copyright, proprietary database, trademark, trade secret, rights of publicity, confidential information, or other property rights, including all worldwide rights therein, in any case (with respect to clauses (a) and (b) of this definition), that is or was conceived, created or developed in whole or in part by You while employed by the Company and that either (i) is created within the scope of Your employment, (ii) is based on, results from, or is suggested by any work performed within the scope of Your employment and is directly or indirectly related to the Business of the Company or a line of business that the Company may reasonably be interested in pursuing, (iii) has been or will be paid for by the Company, or (iv) was created or improved in whole or in part by using the Company's time, resources, data, facilities, or equipment.

APPENDIX B

The following shall apply to modify provisions of the Agreement, where applicable, based upon the controlling law in the state where You (Employee) primarily reside when last employed by the Company if the Governing Law in Section 17 of the Agreement is determined by a court or arbitrator not to control or is expressly described as inapplicable to You below.

**Alabama:** If Alabama law is deemed to apply, then the definition of "Restricted Employee" shall be modified to those employees who are in a position uniquely essential to the management, organization, or service of the business (such as an employee involved in management or significant customer sales or servicing).

**California:** If You are a resident of California, then for so long as You are a resident of California, then: (a) Section 17 (Governing Law; Jurisdiction) and Section 22 (Consent to Jurisdiction and Venue) shall not apply. For the avoidance of doubt, nothing in this Agreement will require You to adjudicate outside of California a claim arising in California or in any other way deprive You of the substantive protection of California law with respect to a controversy arising in California; and. (b) Section 3 (Non-Solicitation of VIP Customers), Section 4 (Non-Recruit of Employees) and Section 5 (Non-Competition) shall not apply post-employment. However, any conduct relating to the solicitation of Company's customers or employees that involves the misappropriation of the Company's trade secret information, such as its protected customer information, will remain prohibited conduct at all times.

Section 14 (Attorneys' Fees) is rewritten as follows: "In the event that the Company is successful in securing any temporary, preliminary, and/or permanent injunctive relief, and/or an award of damages or other judicial relief against me in connection with any breach of this Agreement, You agree that the Company shall also be entitled to recover all remedies that may be awarded by a court of competent jurisdiction or arbitrator and any other legal or equitable relief allowed by law."

The following language is added to Section 2 (Confidential Information): "In addition, nothing in this Agreement, including the confidentiality provisions, shall be construed as a waiver of Your right to testify in an administrative, legislative, or judicial proceeding when You have been required or requested to attend such a proceeding pursuant to a court order, subpoena, or written request from an administrative agency or the legislature, nor shall anything in this Agreement prevent You from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that Employee has reason to believe is unlawful."

**Colorado:** If You are a resident of Colorado, then for so long as You are a resident of Colorado, then:

(a) Noncompetition and Customer Non-solicitation Restrictions. If You do not earn an amount of annualized cash compensation equivalent to or greater than the threshold amount for highly compensated workers, $112,500 (or the earnings threshold in effect as adjusted annually after August 10, 2022, by the Colorado Division of Labor Standards and Statistics in the Department of Labor and Employment)("Noncompetition Earnings Threshold"), then Section 5 (Non-Competition) shall not apply after the end of Your employment with the Company. If You do not earn an amount of annualized cash compensation equivalent to or greater than sixty-percent of the threshold amount for highly compensated workers, $67,500 (or the earnings threshold in effect as adjusted annually after August 10, 2022, by the Colorado Division of Labor Standards and Statistics in the Department of Labor and Employment)("Customer Non-solicitation Earnings Threshold"), then Section 3 (Non-Solicitation of VIP Customers) shall not apply after Your employment with the Company ends.

The definition of "VIP Customer" shall be modified to cover only those VIP customers with respect to which You would have been provided trade secret information during the Look Back Period. You stipulate that the noncompetition obligations and customer non-solicitation obligations in Sections 3 and 5 are reasonable and necessary for the protection of trade secrets within the meaning § 8-2-113(2)(b) (the "Colorado Noncompete Act").

(b) Notice. You acknowledge that You received notice of the covenant not to compete and its terms before You accepted an offer of employment, or, if a current employee at the time You enter into this Agreement, at least fourteen (14) days before the earlier of the effective date of the Agreement or the effective date of any additional compensation or change in the terms or conditions of employment that provides consideration for the covenant not to compete.

(c) Section 17 (Governing Law) and Section 22 (Consent to Jurisdiction and Venue) shall not apply. For the avoidance of doubt, nothing in this Agreement will require You to adjudicate outside of Colorado a claim arising in Colorado or in any other way deprive You of the substantive protection of Colorado law with respect to a controversy arising in Colorado.

(d) Limitations. In addition to the other forms of Protected Conduct, nothing in the Agreement prohibits disclosure of information that arises from the worker's general training, knowledge, skill, or experience, whether gained on the job or otherwise, information that is readily ascertainable to the public, or information that a worker otherwise has a right to disclose as legally protected conduct.  Nothing in this Agreement or Company policy limits or prevents a worker from disclosing information about workplace health and safety practices or hazards. Further, in addition to the other forms of Protected Conduct, nothing in the Agreement shall be construed to prohibit me from disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that You have reason to believe is unlawful.

**District of Columbia:** If You perform a majority of Your work in the District of Columbia or You are based in District in Columbia and do not perform the majority of Your work in any other jurisdiction, then the Agreement will be modified as follows:

(a) the Section 5 (Non-Competition) will not be enforceable against You after Your employment with the Company ends unless You earn (or am anticipated to earn) from the Company at least $150,000 in compensation in a consecutive 12-month period, increased in proportion to the annual average increase, if any, in the Consumer Price Index for All Urban Consumers in the Washington Metropolitan Statistical Area published by the Bureau of Labor Statistics of the United States Department of Labor for the previous calendar year ("Earnings Threshold");

(b) nothing in this Agreement or any Company policy restricts You from having additional employment or contract work in addition to their employment with the Company so long as the employment or work does not violate Your duty of loyalty or create a conflict of interest and would not result in the employee's disclosure or use of Confidential Information. You shall notify the Company's Human Resources in writing prior to accepting any such additional employment or contract work so the Company may determine whether such employment violates or would likely violate this subparagraph (b) of the D.C. appendix;

(c) subject to the limitation in subparagraph (a) of the D.C. appendix, the noncompetition obligations shall include the term of your employment and the 365 days following the termination of your employment, regardless of the reason;

(d) You acknowledge You received a copy of the Agreement, including the Appendix, at least 14 calendar days before You began working for the Company, if a new hire, or, at least 14 days before You were required to sign the Agreement, if already employed by the Company at the time You were asked to sign the Agreement. If Your compensation meets the Earnings Threshold, You further acknowledge that You received the following notice: "*The District's Ban on Non-Compete Agreements Amendment Act of 2020 limits the use of non-compete agreements. It allows employers to request non-compete agreements from highly compensated employees, as that term is defined in the Ban on NonCompete Agreements Amendment Act of 2020, under certain conditions. SidePrize LLC, d/b/a PrizePicks has determined that you are a highly compensated employee. For more information about the Ban on Non-Compete Agreements Amendment Act of 2020, contact the District of Columbia Department of Employment Services (DOES).*"

**Illinois:** If Illinois law is deemed to apply, then:

(a) Section 5 (Non-Competition) shall not apply if You earn equal to or less than $75,000 annually ("Non-Competition Earnings Threshold") (with the Non-Competition Earnings Threshold increasing by $5,000 every five years from January 1, 2027 through January 1, 2037);

(b) Sections 3 (Non-Solicitation of VIP Customers) and 4 (Non-Recruit of Employees) shall not apply if You earn equal or less than $45,000 annually ("Non-Solicit Earnings Threshold")(with the Non-Solicit Earnings Threshold increasing by $2,500 every five years from January 1, 2027 through January 1, 2037);

(c) You further agree that if, at the time You sign the Agreement, Your earnings do not meet the Non-Competition Earnings Threshold and/or the Non-Solicit Earnings Threshold, then Section 5 (Non-Competition) will automatically become enforceable against You if and when You begin earning an amount equal to or greater than the Non-Competition Earnings Threshold, and Sections 3 (Non-Solicitation of VIP Customers) and 4 (Non-Recruit of Employees) will automatically become enforceable against You if and when You begin earning an amount equal to or greater than the Non-Solicit Earnings Threshold;

(d) You acknowledge You received a copy of the Agreement at least 14 calendar days before the effective date; and

(e) Section 14 (Attorneys' Fees) shall be replaced with the following language: "In the event that any action is filed to enforce or invalidate the terms and conditions of this Agreement, the prevailing party in the action will recover from the non-prevailing party, in addition to any other sum that either party may be called upon to pay, a reasonable sum for the prevailing party's attorney's fees and costs. The Company shall be deemed the prevailing party if it is awarded any part of the legal or equitable relief it seeks, irrespective of whether some of the relief it seeks is denied or modified."

**Indiana**: If Indiana law is deemed to apply, then: the definition of "Restricted Employee" shall be modified to be further narrowed to those employees who have access to or possess any Confidential Information that would give a competitor an unfair advantage.

**Louisiana**: If Louisiana law is deemed to apply, then: (a) the meaning of Your "Territory" shall be understood to include the parishes (and equivalents) in the following list so long as Company continues to carry on business therein:  Acadia, Allen, Ascension, Assumption, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Calcasieu, Caldwell, Cameron, Catahoula, Claiborne, Concordia, Desoto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Iberia, Iberville, Jackson, Jefferson Davis. Jefferson, Lafayette, Lafourche, LaSalle, Lincoln, Livingston, Madison, Morehouse, Natchitoches, Orleans, Ouachita, Plaquemines, Pointe Coupee, Rapides, Red River, Richland, Sabine, St. Bernard, St. Charles, St. Helena, St. James, St. John the Baptist, St. Landry, St. Martin, St. Mary, St. Tammany, Tangipahoa, Tensas, Terrebonne, Union, Vermillion, Vernon, Washington, Webster, West Baton Rouge, West Carroll, West Feliciana, Winn; and, if counties (or their equivalents) in Your Territory that are located outside of Louisiana must also be specified by name, Employee acknowledges that the names at issue are those listed by the U. S. Census Bureau for the remainder of the United States found at https://en.wikipedia.org/wiki/List_of_counties_by_U.S._state (summarizing data from www.census.gov and incorporated herein by reference) and same are all incorporated herein by reference; and (b) Section 3 (Non-Solicitation of VIP Customers) (as well as the non-competition in Section 5) shall be limited to the parishes and counties (or their equivalents) from the foregoing lists that fall within Your Territory.  You agree that the foregoing provides You with adequate notice of the geographic scope of the restrictions contained in the Agreement by name of specific parish or parishes (and equivalents), municipality or municipalities, and/or parts thereof.

**Maine**: If Maine law is deemed to apply, then: (a) You acknowledge that if You were being initially hired by the Company that You were notified a noncompete agreement would be required prior to their receiving a formal offer of employment from the Company and You were given a copy of the Agreement at least three business days before they were required to sign the Agreement; (b) Section 5 (Non-Competition) will not take effect until one year of employment or a period of six months from the date the agreement is signed, whichever is later; and (c) Section 5 (Non-Competition) shall not apply if You earn at or below 400% of the federal poverty level.

**Maryland**: If Maryland law is deemed to apply, then: Section 5 (Non-Competition) shall not apply if You earn equal to or less than 150% of Maryland's minimum wage. However, You will have an obligation not to take and use for a competing business a client list or other proprietary client-related information irrespective of what You earn.

**Massachusetts**: If  Massachusetts law is deemed to apply, then: Section 3 (Non-Competition) shall not apply after the end of Your employment with the Company.

**Minnesota**: If You are a resident of Minnesota, then for so long as You are a resident of Minnesota, then: If entering into this Agreement in connection with the start of Your employment with the Company, You acknowledges that You were provided with notice of this Agreement when offered employment and was aware that execution of an agreement with non-solicitation restrictions was a requirement of employment when You accepted the Company's offer. If entering into this Agreement after the commencement of employment, You acknowledge that You received independent consideration for the covenants in this Agreement and was aware that execution of an agreement with non-solicitation restrictions was a requirement of employment before You accepted the additional consideration. In addition, Section 5 (Non-Competition) shall not apply after Your employment with the Company ends, and Section 17 (Governing Law) and Section 22 (Consent to Jurisdiction and Venue) shall not apply. For the avoidance of doubt, nothing in this Agreement will require You to adjudicate outside of Minnesota a claim arising in Minnesota or in any other way deprive You of the substantive protection of Minnesota law with respect to a controversy arising in Minnesota..

**Missouri**: If Missouri law is deemed to apply, then the definition of "Restricted Employee" shall be modified to be further limited to excluded from its definition any employee who provides only secretarial or clerical services.

**Nebraska:** If Nebraska law is deemed to apply, then: (a) the definition of "VIP Customer" is modified so that it is further narrowed to any VIP persons or entities with which You, alone or in combination with others, handled, serviced or solicited at any time during the Look Back Period; and (b) Section 5 (Non-Competition) shall not apply post-employment.

**Nevada:** If Nevada law is deemed to apply, then: (a) the non-compete obligations in Section 5 will not become effective until You have either been employed by the Company for sixty (60) days or received $5,000 in wages from the Company; and (b) Section 3 (Non-Solicitation of VIP Customers) does not preclude You from providing services to any former client or customer of the Company if: (i) You did not solicit the former customer or client; (ii) the customer or client voluntarily chose to leave and seek services from Employee; and (iii) You are otherwise complying with the limitations in this Agreement as to time, geographical area and scope of activity to be restrained. Further, if You are paid solely on an hourly wage basis (exclusive of tips and gratuities), Section 5 (Non-Competition) shall not apply. If Your employment with the Company is terminated as a result of a reduction in force, reorganization or similar restructuring of the Company, the non-competition covenant will only be enforceable during the period in which the Company is paying Your salary, benefits or equivalent compensation, including without limitation, severance pay, if it elects to make such a payment.

**New Hampshire:** If New Hampshire law is deemed to apply, then: (a) Section 5 (Non-Competition) does not apply if You earn an hourly rate less than or equal to 200 percent of the federal minimum wage or tipped minimum wage; and (b) You acknowledge that You were given a copy of this Agreement prior to a change in job classification or acceptance of an offer of employment.

**New York:** If New York law is deemed to apply, then: the definition of "VIP Customer" shall be modified to exclude those clients who became a customer of Company as a result of Your independent contact and business development efforts with the customer prior to and independent from their employment with the Company.

**North Carolina:** If North Carolina law is deemed to apply, then the Look Back Period shall be calculated looking back one year from the date the employment ends or two years from the date of enforcement and not from the date employment ends, whichever provides the Company the greatest protection and is enforceable under applicable law.

**North Dakota:** If North Dakota law is deemed to apply, then: Section 3 (Non-Solicitation of VIP Customers) and Section 5 (Non-Competition) shall not apply post-employment. However, any conduct relating to the solicitation of Company's customers or employees that involves the misappropriation of the Company's trade secret information, such as its protected customer information, will remain prohibited conduct at all times.

**Oklahoma:** If Oklahoma law is deemed to apply, then: (a) Section 5 (Non-Competition) shall not apply post-employment; and (b) Section 3 (Non-Solicitation of VIP Customers) shall be amended to provide that notwithstanding anything in it to the contrary, You shall be permitted to engage in the same business as that conducted by Company or in a similar business as long as You do not directly solicit the sale of goods, services or a combination of goods and services from the established customers of the Company.

**Oregon:** If Oregon law is deemed to apply, then: unless the Company chooses to compensate You as allowed under the Oregon Noncompete Act (Or. Rev. Stat. §653 et seq.), Section 5 (Non-Competition) shall only apply to You if: (a) You are engaged in administrative, executive or professional work and perform predominantly intellectual, managerial, or creative tasks, exercises discretion and independent judgment and earn a salary; (b) the Company has a "protectable interest" (meaning, access to trade secrets or competitively sensitive confidential business or professional information that otherwise would not qualify as a trade secret, including product development plans, product launch plans, marketing strategy or sales plans); and (c) the total amount of Your annual gross salary and commission, calculated on an annual basis, at the time of my termination, exceeds $108,576 (or the earnings threshold in effect based on annual adjustment for inflation pursuant to the Consumer Price Index for All Urban Consumers, West Region (All Items), as published by the Bureau of Labor Statistics of the United States Department of Labor immediately preceding the calendar year of my termination). In addition, if You are a new employee, You acknowledge that You were notified in a written offer of employment received two weeks before the commencement of employment that a noncompetition agreement was a condition of employment.

**Rhode Island:** If Rhode Island law is deemed to apply, then Section 5 (Non-Competition) shall not apply to You post-employment if You are: classified as non-exempt under the FLSA; an undergraduate or graduate student in an internship or short-term employment relationship; 18 years of age or younger; or a low wage employee (defined as earning less than 250% of the federal poverty level).

**Virginia:**  If Virginia law is deemed to apply:

(a) the parties agree that the non-competition and non-solicitation obligations are reasonably limited in nature and do not prohibit employment with a competing business in a non-competitive position;

(b) Section 5(ii) in the non-competition restrictions shall not apply; and

(c) If You reside in Virginia and their average weekly earnings calculated as provided for under Code of Virginia §40.1-28.7:7 (the "Virginia Act"), are less than the average weekly wage of the Commonwealth as determined pursuant to subsection B of §65.2-500 or Employee otherwise qualifies as a "low-wage employee" under the Virginia Act then the non-competition obligations in Section 5 shall not apply to You and nothing in Section 3 (Non-Solicitation of VIP Customers) shall restrict You from providing a service to a customer or client of the Company if You do not initiate contact with or solicit the customer or client. You shall not be considered a "low-wage employee" if Your earnings are derived, in whole or in predominant part, from sales commissions, incentives, or bonuses paid to the employee by the Company.

**Washington:**

If Employee is a resident of Washington, then for so long as Employee is a resident of Washington, then, the Agreement will be modified and applied as follows:

(a) Unless You earns from the Company at least $116,594 in Box 1 W-2 annual compensation, as adjusted annually for inflation by the Washington State Department of Labor & Industries ("Washington Earnings Threshold"), after Your employment with the Company ends;

(1) Section 5 (Non-Competition) shall not apply;

(2) Section 3 (Non-Solicitation of VIP Customers) is modified to only prohibit solicitation by You of any VIP Customer to cease or reduce the extent to which it is doing business with the Company, in accordance with the definition of a "Non-solicitation agreement" under the Washington Act (Rev. Code of Wash. (RCW) §§49.62.005 - 900); and

(3) Section 4 (Non-Recruit of Employees) is modified to only prohibit solicitation by You of any employee with whom You worked, supervised or received Confidential Information about during the Look Back Period, to leave their employment with the Company, in accordance with the definition of a "Non-solicitation agreement" under the Washington Act (Rev. Code of Wash. (RCW) §§49.62.005 – 900.

(b) If, at the time You sign the Agreement, Your earnings do not meet the Washington Earnings Threshold, then the modifications in Section (a) of the Washington section of this Appendix shall no longer apply and Sections 3 through 5 of the Agreement will automatically become enforceable against Employee as originally drafted if and when Employee begin earning an amount more than the Washington Earnings Threshold annually.

(c) The Company further agrees that if Your employment with the Company is terminated as the result of a layoff, the modifications in Section (a) of the Washington section of this Appendix shall apply unless, during the period of enforcement, the Company pays You compensation equivalent to Your final base pay at the time of the termination of Your employment, minus the amount of any compensation You earn through employment after the end of Your employment with the Company, which You agree to promptly and fully disclose. For purposes of this section, "layoff" means termination of Your employment by the Company for reasons of Your insolvency or other purely economic factors, and specifically excludes termination of Your employment for any other reason, either with or without cause.

(d) Section 17 (Governing Law) and Section 22 (Consent to Jurisdiction and Venue) shall not apply. For the avoidance of doubt, nothing in this Agreement will require You to adjudicate outside of Washington a claim arising in Washington or in any other way deprive You of the substantive protection of Washington law with respect to a controversy arising in Washington.

(e) You acknowledge and agree that You had the opportunity to review and consider the terms of the Agreement before accepting an offer of employment with the Company.

DocuSign Envelope ID: BFC0A242-13A6-4A17-8490-A89C503C50C1

(e) In addition to the other forms of Protected Conduct, nothing in the Agreement prohibits disclosure or discussion of conduct You reasonably believe to be illegal discrimination, illegal harassment, illegal retaliation, a wage and hour violation, or sexual assault, or that is recognized as against a clear mandate of public policy.

(f) Nothing in this Agreement shall restrict You from having an additional job, supplementing their income by working for another employer, working as an independent contractor, or being self-employed if You do not earn at least twice the Washington minimum hourly wage, though You will still be subject to the common law duty of loyalty and the Company's Code of Conduct and the employment cannot interfere with the reasonable and normal scheduling expectations of the Company.

**Wisconsin:** If Wisconsin law is deemed to apply, then: (a) the Fairness Extension in Section 11 shall not apply; and (b) the definition of "Restricted Employee" shall be modified to be further narrowed to those employees who are either entrusted with Confidential Information or employed in a position essential to the management, organization, or service of the business (such as, but not limited to maintaining Company's customer relationships).